# Exhibit 21

Back to Summary Report          PREV 2 of 4 NEXT

**Citation # 1**
**2001 U.S. Dist. LEXIS 21032**

LAURA WOODS, Plaintiff v. BERRY, FOWLES & CO., Defendant

Civil No. 01-CV-37-B-C

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE

2001 U.S. Dist. LEXIS 21032; 27 Employee Benefits Cas. (BNA) 1618

December 14, 2001, Decided

**DISPOSITION:** [*1] Magistrate recommends that defendant's motion for summary judgment as to Counts I, II, IV, V, and VI be GRANTED and defendant's motion for summary judgment as to Count III be DENIED.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Plaintiff widow sued defendant company, alleging state law claims and an ERISA claim. The matter was referred to a magistrate judge. The company moved for summary judgment.

**OVERVIEW:** The widow sought a death benefit under life insurance allegedly promised to her deceased husband by the company, which employed the husband. The company argued that the state law claims were preempted by ERISA. The company also argued that, as to the ERISA claim, the widow was not entitled to death benefits under the plan administered by the company, because he was denied coverage. The widow argued that her husband was offered life insurance equal to three time his salary. As to the state law claims, the court found that the company denied the husband coverage under one plan, and that he was not promised alternative life insurance company by an authorized agent of the company. The court further found that the plan at issue was governed by ERISA. Under the plan, the company had ongoing administrative obligations. The state law claims related to the plan; the state law causes of action provided alternative enforcement mechanisms to obtain ERISA benefits. As to the ERISA claim, the company was not entitled to judgement as a matter of law if its conduct alone prevented the husband from qualifying as a plan participant.

**OUTCOME:** The court recommended that the motion be granted as to all claims except the ERISA claim.

**CORE TERMS:** life insurance, coverage, state law, preempted, summary judgment, employee benefit plan, beneficiary, cause of action, promised, premium, salary, denied coverage, interview, ongoing, office manager, insurability, full-time, plan participant, payroll, contingent, provider, hired, staff, duty, state law claim, preemption, one-time, prevail, negligent misrepresentation, group life insurance

**LexisNexis(TM) Headnotes**

***Civil Procedure > Summary Judgment > Summary Judgment Standard***

*HN1* Summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter at law. Fed. R. Civ. P. 56(c). A fact is "material" when it has the potential to affect the outcome of the suit under the applicable law. A "genuine issue" exists when the evidence is sufficient to support rational resolution of the point in favor of either party.

***Civil Procedure > Summary Judgment > Burdens of Production & Proof***

*HN2* Summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

***Business & Corporate Entities > Agency > Authority to Act > Apparent Authority***

*HN3* Apparent authority results from conduct by the principal which causes a third person reasonably to believe that a particular person has authority to enter into negotiations or to make representations as his agent.

***Labor & Employment Law > Employee Retirement Income Security Act (ERISA) > Federal Preemption***

*HN4* See 29 U.S.C.S. § 1144(a).

***Labor & Employment Law > Employee Retirement Income Security Act (ERISA) > Federal Preemption***

*HN5* See 29 U.S.C.S. § 1144(c)(1).

***Labor & Employment Law > Employee Retirement Income Security Act (ERISA) > Federal Preemption***

*HN6* A state law cause of action will be preempted by ERISA if two conditions exist: (1) the plan at issue is an employee benefit plan, and (2) the cause of action relates to an employee benefit plan.

***Labor & Employment Law > Employee Retirement Income Security Act (ERISA)***

*HN7* See 29 U.S.C.S. § 1002(1).

***Labor & Employment Law > Employee Retirement Income Security Act (ERISA) > Donovan v. Dillingham Test***

*HN8* For purposes of ERISA, an employee benefit package is an employee welfare benefit plan only if its provision by nature requires an ongoing administrative program to meet the employer's obligation. Several circuit courts have read the United States Supreme Court's Fort Halifax decision as emphasizing the mechanical one-time nature of severance payments and these courts have ceased to apply the decision where the employer promise involved ongoing obligations materially beyond those present in the Fort Halifax decision. In essence, the Fort Halifax decision provides an initial threshold: If an employer's obligations do not go beyond those present in the Fort Halifax decision, the plan is not an ERISA plan. However, beyond this threshold, there is no authoritative checklist to conclusively determine whether a particular plan is an employee benefit plan governed by ERISA.

***Labor & Employment Law > Employee Retirement Income Security Act (ERISA) > Donovan v. Dillingham Test***

*HN9* Under the first Donovan test, to determine whether a plan is a welfare benefit plan under ERISA, the following five elements must exist: (1) a plan, fund or program (2) established or maintained (3) by an employer or by an employee organization, or by both (4) for the purpose of providing medical, surgical, hospital care, sickness, accident, disability, death, unemployment or vacation benefits, apprenticeship or other training programs, day care centers, scholarship funds, prepaid legal services or severance benefits (5) to participants or their beneficiaries. In order to determine whether a plan has been established, the Dovovan test inquires whether, from the surrounding circumstances, a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of

financing, and procedures for receiving benefits.

**Labor & Employment Law > Employee Retirement Income Security Act (ERISA) > Donovan v. Dillingham Test**

HN10 Ultimately, the question of whether an ERISA plan exists is a question of fact, to be answered in light of all the surrounding facts and circumstances from the point of view of a reasonable person. The analysis is conducted on a case-by-case basis and involves consideration of the two purposes of ERISA. ERISA's primary goals are to protect employees from abuse and mismanagement of funds and to protect employers' interests by eliminating the threat of conflicting or inconsistent state and local regulation of employee benefit plans. In light of these purposes, the factors to be considered are the nature and extent of the employer's benefit obligations, the amount of discretion the employer has in administering the plan, whether the plan requires an ongoing administrative program, and the employer's intent.

**Labor & Employment Law > Employee Retirement Income Security Act (ERISA) > Donovan v. Dillingham Test**

HN11 Although no single act by an employer in itself is determinative, certain factors are more indicative of the existence of an ERISA plan than others. For example, in cases where an employer has purchased insurance, the crucial factor is whether the purchase constituted an expressed intention by the employer to provide benefits on a regular and long term basis. Additionally, the purchase of a group policy covering a class of employees offers substantial evidence that the plan has been established.

**Labor & Employment Law > Employee Retirement Income Security Act (ERISA) > Donovan v. Dillingham Test**

HN12 According to the Fort Halifax decision, an ERISA plan must by nature require an ongoing administrative program to meet the employer's obligations.

**Labor & Employment Law > Employee Retirement Income Security Act (ERISA) > Administrative Provisions**

HN13 The payroll practices exception of 29 C.F.R. § 2510.3-1(b) states that the terms "employee welfare benefit plan" and "welfare plan" do not include compensation payments by employers for certain purposes. The exception does not exclude an employer's premium payment for group life insurance.

**Labor & Employment Law > Employee Retirement Income Security Act (ERISA) > Administrative Provisions**

HN14 The payroll practice exception created in 29 C.F.R. § 2510.3-1(b) applies to occasional, temporary benefits paid from general assets, such as overtime, holiday pay, sick pay, vacation pay, pay during active military duty, training pay, and payments during sabbatical leave.

**Labor & Employment Law > Employee Retirement Income Security Act (ERISA) > Federal Preemption**

HN15 A state law relates to an employee benefit plan if it has a connection with or reference to such a plan. There are two tests for determining whether a state law cause of action relates to an ERISA plan. First, a state law claim is preempted by ERISA where a plaintiff, in order to prevail, must prove the existence of, or specific terms of, an ERISA plan. Second, a state law claim is preempted if it conflicts directly with an ERISA cause of action. If a state law cause of action relates to an employee benefit plan in a manner which is too tenuous, remote, or peripheral, the state law cause of action will not be preempted.

**Labor & Employment Law > Employee Retirement Income Security Act (ERISA) > Federal Preemption**

HN16 Where a state law cause of action provides an alternative enforcement mechanism to ERISA's enforcement regime, the action is related to an ERISA plan and therefore is preempted. The inquiry involves looking beyond the face of the complaint and determining the real nature of the claim.

*Labor & Employment Law > Employee Retirement Income Security Act (ERISA) > Federal Preemption*
HN17⬆ When plaintiff brings a claim under ERISA based on precisely the same conduct that underlies his state law claims, then the state law claims are viewed as alternative mechanisms for obtaining ERISA plan benefits and are thus preempted.

*Labor & Employment Law > Employee Retirement Income Security Act (ERISA) > Federal Preemption*
HN18⬆ A plaintiff's characterization of what would otherwise be an ERISA claim as a state law claim does not affect the preemption power of ERISA.

*Labor & Employment Law > Employee Retirement Income Security Act (ERISA) > Federal Preemption*
HN19⬆ In the context of an ERISA plan, the United States Supreme Court's definition of "participant" includes employees who do not achieve the actual status of a participant, but who are employees reasonably expected to be in currently covered employment. Several circuits have articulated a clear recognition that an employer who denies an employee plan participant status through its own conduct should be barred from using state law preemption to leave the plaintiff without any remedy.

*Labor & Employment Law > Employee Retirement Income Security Act (ERISA) > Donovan v. Dillingham Test*
HN20⬆ See 29 U.S.C.S. § 1002(b).

**COUNSEL:** For LAURA WOODS, plaintiff: WILLIAM D. ROBITZEK, BERMAN & SIMMONS, P.A., LEWISTON, ME.

For BERRY FOWLES & CO, defendant: KATE S. DEBEVOISE, RONALD W. SCHNEIDER, JR., ESQ., BERNSTEIN, SHUR, SAWYER, & NELSON, PORTLAND, ME.

**JUDGES:** Margaret J. Kravchuk, U.S. Magistrate Judge.

**OPINIONBY:** Margaret J. Kravchuk

### OPINION: RECOMMENDED DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Berry, Fowles & Co. moves for summary judgment on the ground that plaintiff's state law claims, Counts I, II, IV, V, and VI are preempted by ERISA § 1144(a) and in the alternative, that plaintiff has failed to present admissible evidence to satisfy the elements of the state law claims. (Docket No. 15.) Defendant also moves for summary judgment on Count III, the ERISA claim, arguing that plaintiff is not entitled to death benefits under the plan administered by Berry, Fowles & Co.. (Docket No. 15.) I recommend that the Court **GRANT** defendant's motion for summary judgment as to Counts I, II, IV, V, and VI as preempted [*2] by ERISA and **DENY** defendant's motion for summary judgment as to Count III.

#### Summary Judgment Standard

HN1⬆ Summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter at law." Fed. R. Civ. P. 56(c). A fact is "material" when it has the "potential to affect the outcome of the suit under the applicable law." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)). A "genuine issue" exists when the evidence is "sufficient to

support rational resolution of the point in favor of either party." Id. <sup>HN2</sup>Summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).

**Facts**

Plaintiff (hereinafter "Mrs. Woods") brings this action to claim a death benefit [*3] under life insurance allegedly promised to her deceased husband by his employer, Berry, Fowles & Co.. Defendant, Berry, Fowles & Co. is an accounting firm, organized as a corporation with a principle place of business in Maine and owned by George Howard, Mike Royer, and Donald Talbot. (Def.'s Statement of Material Facts (DSMF) P 1; Pl.'s Resp. Def.'s Statement of Material Facts (PRSMF) P 55.)

Sometime prior to September 1, 1998, Howard, the director and treasurer of Berry, Fowles & Co., interviewed Michael Woods ("Woods") for a full-time staff accountant position. (DSMF P 4.) Although Howard does not recall specific questions or discussion with Woods, he does remember the conversation occurring. (PRSMF PP 40, 41; Def.'s Reply to Pl.'s Additional Statement of Material Facts (DRSMF) P 41.) During the interview, Howard informed Woods of the salary, the medical insurance, the vacation and holiday pay and the life insurance. (PRSMF P 47; DSMF P5.) Howard described to Woods the same benefits available to the other staff accountants at Berry, Fowles & Co. and described the standard life insurance coverage as three times the annual salary. (PRSMF P 41.)

At some point after the interview, [*4] Woods returned to the car where Mrs. Woods had been waiting for him. (PRSMF P 46.) Once in the car, Woods told his wife, "they offered me the job and the benefits are [sic] they pay eighty-five percent of a family policy for health insurance, I would pay fifteen, and they offer life insurance of triple your salary, and paid vacation one week in the first year -- or for the first year with incremental increases in that [sic] with longevity, and that there were paid holidays and he did not know just which ones." (Id.) Woods further stated that he did not have to do anything as the benefits began on the first day of employment. (Id. P 48.) Woods either was not informed or did not mention to his wife that he had to complete an application and be approved for the life insurance and that the life insurance was confined to one provider. (Id. PP 15, 48.) The life insurance was an incentive to the Woods because they were nearly fifty-years old, they had a family and felt they needed more life insurance. (Id. P 49.) The day after his interview, Woods accepted the position at Berry, Fowles & Co. as a full-time staff accountant effective September 1, 1998. (Id. P 48; DSMF [*5] P 2.)

On September 11, 1998, Woods wrote a Memo of Understanding at Howard's request outlining his understanding of the terms of employment. (DSMF P 4.) Howard requested such memos in order to discover any misunderstanding at the beginning of employment. (PRSMF P 43.) In his Memo, Woods noted his salary, but did not mention any of the benefits offered to him. (DSMF P 4, Ex. B1.) The memo is not considered to be a complete recitation of the terms of Woods' employment. (PRSMF P 4.)

At the time Woods was hired and throughout his employment, Berry, Fowles & Co. participated in a group insurance plan titled the American Institute of Certified Public Accountants Insurance Trust ("the AICPA plan") which was provided through the American Institute of Certified Public Accountants ("AICPA"). (DSMF PP 8, 11.) The AICPA plan required employees to have six-months continuous service with Berry, Fowles & Co. and have an application approved by Prudential. (DSMF P 24; PRSMF P 24.) The application required employees to submit evidence of insurability. (DSMF P 15.) The condition of insurability is provided in the Administration Manual and on the application. (DRSMF P 41.) Berry, Fowles &

Co. did not [*6] create its own written document to describe the life insurance it offered. (PRSMF P 41.)

AICPA supplied an administration manual to assist employers in managing the AICPA plan. (DSMF P 13.) The company designated the Office Manger, Roland Paquin, to administer the AICPA plan. (Id. P 21.) The AICPA plan required Paquin to prepare monthly or quarterly reports. (Id. PP 19, 21, 23.) The AICPA plan expected Berry, Folwes & Co. to calculate the premiums it owed and report the addition or termination of employees. (Id. P 19.) The company was responsible for paying the entire premium amount. (Id. P 6.) Paquin's duties as Office Manager included the responsibility of submitting employee's applications for approval. (Id. PP 23, 52.) The Administrative Plan manual states that the employer should complete the section labeled "To be Completed by Firm" and should "instruct the eligible individual on how to complete the form... ." (PRSMF P 18.) The Summary Plan Description states that Prudential pays the benefits under the plan and makes claim decisions. (Id. P 17.) Berry, Fowles & Co. had no responsibility for accepting claims, making determinations on claims, or paying [*7] death benefits under the plan. (DRSMF P 17.)

In November 1998, Paquin, who at the time was employed as a staff accountant for defendant, became the Office Manager. During June and September of the following year, 1999, Paquin researched insurance providers other than AICPA, although Berry, Fowles & Co. had exclusively participated with AICPA during the past ten years. (PRSMF P 56; DRSMF PP 56, 58, 61.) With the assistance of David Hamilton, an insurance agent, Paquin obtained a quote from UNUM on an insurance package and provided it to Howard sometime after September 1999. (PRSMF P 59; DRSMF P 59.) Berry, Fowles & Co. did not take any action at that time. (PRSMF P 59.) The company continued to participate in the group life insurance plan with AICPA. (DSMF P 9.)

During September of 1999, almost one year after assuming the position of Office Manager, Paquin realized he had not received any information relating to his own life insurance plan with Berry, Fowles & Co.. (PRSMF P 52.) After checking into the matter, Paquin discovered he was not covered because an application for insurance had not been submitted to AICPA for approval. (Id.) He learned that the plan was self-administering, [*8] meaning that Berry, Fowles & Co. was to submit applications for new employees. (Id. P 53.) As Paquin was responsible for making sure that applicants received their application forms (Id. P 52, Ex. C at 38), he promptly circulated the applications to all employees hired during the past year, including Woods. (DSMF P 26; PRSMF P 53.) Paquin informed Howard of the "problems" with filing the applications and of the gap in coverage for these employees. (PRSMF § 53.) Due to the delay in receiving an application, Woods did not submit his application until September 1999, a year after he was hired. (Id.; DSMF PP 26, 27.)

It appears that prior to September 1999, Paquin was not aware that the AICPA plan required submittal of an application by employees or approval by Prudential. (PRSMF PP 42, 43.) Paquin states that when he was hired in June of 1998, Howard explained that the life insurance coverage began after six months of service and amounted to three times his salary, but Howard did not mention or imply that the insurance was contingent on approval. (Id. P 42.) Additionally, Paquin states that in December of 1998, when he was asked by Howard to write letters of understanding [*9] for potential employees, he did not write that the life insurance was contingent on approval or limited to one carrier. (Id. P 45; DRSMF P 45.)

The AICPA application submitted by Woods and all the other full-time employees was called a "Request for Coverage Form" and was titled as such across the top of the form. The application contained an "Important Notice" that informed Woods that "the insurance is to become effective only upon acceptance by the underwriting company." (DSMF P 29.) By signing the document, Woods, in part, declared the following: I declare that to the best of my

knowledge and belief all of the above answers and those shown on the reverse side to the questions are complete and true. I agree that (1) the insurance applied for is subject to the policy terms and shall become effective on the date or dates established by the policy, provided the evidence of insurability is satisfactory, (2) this form supersedes any prior form I may have completed with respect to the insurance being applied for.(DSMF 28; Ex. 7.) (emphasis added.)

By letter dated October 22, 1999, Paquin and Woods were informed that Woods was denied coverage. (DSMF P 32; PRSMF **[\*10]** P 54.) Paquin was surprised, as this was the first denial he had encountered. (PRSMF P 54.) Paquin verified with Woods that he received the denial letter and informed Howard of the situation. (Id. PP 54, 55.) Shortly thereafter, Paquin discussed the delay and denial of Woods' application with all three owners of Berry, Fowles & Co.. (Id. P 55.) After two other employees were denied by Prudential, the lack of coverage was raised and discussed in another staff meeting. n1 (Id. P 56.) At some point, Paquin had conversations with Hamilton, the insurance agent, who stated there were other coverage options, the denials were not a problem and other arrangements could be made. (Id. P 57.)



- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 Overall, there were four employees besides Woods who were denied coverage under the AICPA plan. (DSMF P 36.) It is not clear whether any of these denials occurred prior to Woods' denial.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

Woods did not mention the denial of coverage to his wife, but did mention it to his son, Norman Woods, sometime between October 22, 1999 and **[\*11]** March 24, 2000. (Id. P 64; DRSMF P 64.) According to Norman Woods his father said that his first application for life insurance had been rejected, but that the office manager at Berry, Fowles & Co. assured him that alternate coverage would be found for him and he should not worry about it. (PRSMF P 64.) Woods informed his son that Howard was a good man and would make sure "this was taken care of." (Id.)

Berry, Fowles & Co. disputes that alternate insurance coverage was sought, promised or obtained for any employee who was denied coverage under the AICPA plan. (DSMF PP 31, 36.) Howard testifies that when he interviewed Woods, he explained that the insurance coverage was through AICPA and was subject to approval by Prudential (Id. P 7), and that Berry, Fowles & Co. would pay the premium if Woods qualified for coverage. (Id. P 6.) Paquin testifies that he did not make any promise to Woods that Berry, Fowles & Co. would seek or obtain alternative insurance coverage for him and states that he did not have authority to make such a promise. (Id. PP 34, 35; PRSMF PP 34, 35.) Hamilton states that when Paquin spoke with him regarding denied coverage, Paquin never indicated **[\*12]** that Berry, Fowles & Co. was interested in obtaining group or individual policies for denied employees. (DRSMF P 57.) It is undisputed that Paquin did not have the authority to promise Woods that Berry, Fowles & Co. would seek alternate life insurance coverage. (DSMF P 35; PRSMF P 35.)

On March 24, 2000, Woods died. (DSMF P 38.) When Mrs. Woods went to Berry, Fowles & Co. to pick up Woods' personal belongings, she learned that a life insurance policy for Woods did not exist through the employer. (PRSMF P 62.) She brought this action on February 28, 2001, as Woods' beneficiary and the personal representative of his estate. (Compl. P 1; DSMF P 1.) She asserts five state law claims: breach of contract (Count I), negligence (Count

II), a third-party beneficiary claim (Count IV), negligent misrepresentation (Count V), and promissory estoppel (Count IV). Mrs. Woods also asserts a claim pursuant to ERISA (Count III) which alleges that by failing to provide the life insurance promised to Woods, Berry, Fowles & Co. violated the AICPA plan. Mrs. Woods was not aware of any other time Woods was denied life insurance. In 1986, Prudential approved Woods for life insurance through a different employer. [*13] (PRSMF P 50; DRSMF P 50.)

At some point, although it is unclear when, Berry, Fowles & Co. did begin a general review of its benefit package. (PRSMF P 58; DRSMF P 58). In July 2000, defendants ceased participating with AICPA and switched to UNUM. (PRSMF P 61; DRSMF P 61.) Although the UNUM plan offers a lesser life insurance coverage, it provides a disability benefit not previously available at Berry, Fowles & Co., it begins immediately, and is neither contingent on insurability nor self-administering. (DRSMF P 61.) Nonetheless, during Woods' employment, the AICPA plan was the only plan Berry, Fowles & Co. had in place and was the only means by which it provided its employees with life insurance coverage. (DSMF PP 8, 12.)

## Discussion

Berry, Fowles & Co. moves for summary judgment asserting that ERISA § 1144(a) preempts the state law claims in Counts I, II, IV, V, and VI and in the alternative, there is insufficient admissible evidence to satisfy the elements of these claims. (Docket No. 15.) Defendant moves for summary judgment on Count III, the ERISA claim, on the ground that Mrs. Woods is not entitled to benefits under the plan administered by Berry, Fowles & Co.. (Id [*14] .)

### *I. Did Defendant Offer a General Life Insurance Benefit or Coverage Under the AICPA Plan?*

Before a determination can be made regarding the motion for summary judgment on the state law claims, I must determine whether there is sufficient credible evidence to support a factfinder's reasonable inference that Berry, Fowles & Co. offered Woods a generic life insurance benefit of three times his salary rather than specific life insurance coverage under the AICPA plan. Both sides agree that during Woods' interview, Howard offered him the same insurance offered to all full-time employees at the company. (PRSMF P 41; DRSMF P 41.). This coverage provided a death benefit of three times an employee's salary. (Id.) The parties dispute that Howard informed Woods that the life insurance was specifically provided through AICPA, was not available until after six months of employment, and was contingent upon approval. (Def.'s Mem. Supp. Mot. Summ. J. (DMSJ) at 2; PRSMF P 48.)

As evidence showing that the life insurance coverage Howard offered did not contain these conditions, Mrs. Woods offers the following statements Woods made to her after his interview with Howard:They [*15] offered me the job and the benefits are [sic] they pay eighty-five percent of a family policy for health insurance, I would pay fifteen, and they offer life insurance of triple your salary, and paid vacation one week in the first year -- or for the first year with incremental increases in that [sic] with longevity, and that there were paid holidays and he didn't know just which ones.(PRSMF P 46.)

She adds that when she asked Woods what he had to do to start the benefits, he stated that they began with employment. (Id. P 48.) She contends that Woods either was not informed or did not mention to her that he had to be approved for coverage and that the plan was limited to a specific provider. n2 (Id. PP 15, 48.)

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 Plaintiff lacks personal knowledge to assert that Woods was not informed. Woods' statements regarding the terms of employment Howard offered are hearsay. Although there is extensive argumentation on the issue of whether they should be deemed admissible under a hearsay exception, it is not necessary to make that determination because, as will be discussed, the statements do not support an inference that Woods was offered anything but the AICPA plan.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**[*16]**

From this statement made to her, Mrs. Woods asserts that a "jury could find that Mr. Woods' understanding that the life insurance benefit would be equal to three times his salary is ...believable, since it was the standard term offered [to] all full time employees, and [is] included in every written understanding of the employment terms at Berry, Fowles & Co. after November 1998." (Pl.'s Resp. Def.'s Mot. Summ. J. (PRMSJ) at 17.) She relies on Paquin's testimony regarding letters of understanding he wrote for defendant to potential employees regarding their compensation and benefits package. However, as these letters were written three months after Woods was hired (DRSMF P 45), and Berry, Fowles & Co. did not issue such a letter to Woods, this testimony is not material to determining what Howard offered Woods during his interview. Moreover, although Mrs. Woods asserts that there was no written documentation of the company's "standard" life insurance (PRMSJ at 13), Berry, Fowles & Co. has established that the Administration Manual and the application for coverage state that the life insurance is contingent upon approval of insurability. (DRSMF P 41.)

Assuming arguendo that an **[*17]** inference could be made that during the interview Howard failed to inform Woods that the life insurance was conditioned upon approval by Prudential and that the insurance was limited to one provider, the fact remains that the AICPA plan was the only insurance plan the company ever utilized. Berry, Fowles & Co. has shown that over the span of ten years it only participated in the AICPA plan and had not provided any other life insurance coverage to any of its employees. (DSMF PP 8, 12; DRSMF P 61.) Mrs. Woods has not offered any evidence that leads to the conclusion that in hiring Woods, Howard deviated from offering the customary life insurance plan through AICPA. See Anderson, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to defeat summary judgment].").

Furthermore, when Paquin provided Woods with the AICPA application for coverage, there is no evidence in the record that Woods protested, complained, or remarked about having to fill out the AICPA application for coverage. There is no suggestion that Woods objected to the qualifying language contained in the application, which states that **[*18]** by signing he agrees that "the insurance applied for... shall become effective on the date...established by the policy, provided the evidence of insurability is satisfactory." (DSMF P 28.) Instead, the record merely reflects that Woods completed the application, signed his name and submitted it for approval or denial. In light of these facts, the only possible conclusion is that during the interview, Howard offered Woods the same insurance benefit offered to all full-time employees, a specific life insurance benefit provided through AICPA requiring approval by Prudential. See Carter v. Amax Coal Corp., 748 F. Supp. 812, 815 (D. Utah 1990) (finding that pre-employment promises were not promises for generic benefits because the promises "involved [defendant's] benefit plan to the extent that the plan was the vehicle for such promises to be fulfilled.").

### 2. Was Alternative Life Insurance Promised?

Mrs. Woods offers three sets of facts as evidence to show that after Woods was denied coverage under the AICPA plan, a promise of alternative coverage was made to him. First, Woods' son, Norman Woods, testified that Woods stated that after he was denied life [*19] insurance through AICPA, the office manager at Berry, Fowles & Co. assured him that alternate coverage would be found. (PRSMF P 64.) Woods also stated to Norman Woods that Howard was a good man and would make sure "this was taken care of." n3 (Id.) Second, Mrs. Woods offers Paquin's testimony that he discussed the Prudential denials with management; that he researched alternative coverage; and that he presented an insurance quote to management who, after Woods' death, switched to a different insurance provider. (Id. PP 55, 56, 58, 59, 61.) Third, she offers Paquin's testimony that during a conversation between defendant's insurance agent and Paquin, Hamilton stated, "there were other ways we could provide that coverage, that the denials were not a problem, and that other arrangements could be made." (Id. P 57.) Although Hamilton's statement to Paquin does not constitute a promise to Woods, this statement and Paquin's research into alternative coverage may be corroborative evidence tending to show that Paquin promised Woods that alternative coverage would be found for him.

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 Defendant claims that these statements to Norman Woods are hearsay and should be stricken by the Court. Mrs. Woods argues that the statements are admissible as either a present sense impression or as a reflection of Woods' state of mind. (PRMSJ at 17.) Woods' statement to Norman Woods regarding Paquin's promise is hearsay to the extent it constitutes a statement, by a person other than the declarant, offered for the truth of the matter asserted (i.e. that Paquin made a promise). See Fed. R. Evid. 801. The statements by Woods to Norman Woods to the extent they are offered to prove the existence of a promise by Paquin cannot be considered by the Court for summary judgment purposes. See Fed. R. Evid. 56(e).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*20]

However, as both parties agree, Paquin did not have the authority to promise Woods that the company would seek or obtain alternative insurance. (DSMF P 35; PRSMF P 35). See Hinchey v. NYNEX Corp., 144 F.3d 134, 140-141 (1st Cir. 1998) (granting defendant's motion for summary judgment in part because plaintiff produced no evidence tending to show that his supervisor had actual authority to negotiate terms of an employment document, nor was there evidence of apparent authority). HN3 Apparent authority "'results from conduct by the principal which causes a third person reasonably to believe that a particular person . . . has authority to enter into negotiations or to make representations as his agent.'" Id. (quoting Linkage Corp. v. Tr. of Boston Univ., 425 Mass. 1, 16, 679 N.E.2d 191 (1997), cert. denied, 522 U.S. 1015, 139 L. Ed. 2d 488, 118 S. Ct. 599 (1997). Mrs. Woods neither alleges nor provides evidence indicating that Berry, Fowles & Co. held Paquin out as a person who had authority to promise alternative insurance on behalf of the company. Additionally, there is no evidence that the company ratified a promise by Paquin. Paquin [*21] denies promising Woods alternative coverage. (DSMF P 34.) No employee denied coverage under the AICPA plan ever obtained alternative life insurance through Berry, Fowles