UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| EDWARD HELLER,<br><br>          Plaintiff,<br><br>          v.<br><br>CAP GEMINI ERNST & YOUNG WELFARE<br>PLAN (RE: ACCIDENTAL DEATH<br>BENEFITS),<br>AMERICAN INTERNATIONAL LIFE<br>ASSURANCE COMPANY OF NEW YORK,<br>CAPGEMINI U.S. LLC<br><br>          Defendants. | CIVIL ACTION<br>NO. 04-11875-WGY |

MEMORANDUM AND ORDER

YOUNG, C.J.                                        October 24, 2005

## I.    INTRODUCTION

At issue in this case is the plaintiff Edward Heller's
("Heller") 29 U.S.C. § 1132(a)(1)(B) claim that the defendants
CapGemini U.S. LLC ("CapGemini") and American International Life
Assurance Company of New York ("American") wrongfully denied him
accidental death benefits under the ERISA-governed insurance
policy of his now deceased wife, a former employee of CapGemini.
American denied Heller benefits because his wife was no longer
employed by CapGemini at the time of her death and therefore not
covered under the unambiguous terms of the policy.

According to Heller, it has not been established that his wife was not covered under the policy at the time of her death. Alternatively, Heller maintains, even if his wife was no longer covered, CapGemini waived the defense of non-coverage by collecting premiums after coverage terminated under the terms of the policy. American waived this defense as well claims Heller, because it willingly accepted the premiums from CapGemini and did not offer to refund them.

## A.    Factual Background

### 1.    Parties

Heller is the husband of Patricia Heller ("Patricia"), now deceased. Pl.'s Rule 56 Statement ("Pl.'s Facts") [Doc. No. 20] ¶ 4. Patricia was an employee CapGemini from March 1991 until her resignation in January 2003. Def. American's Rule 56 Statement ("American's Facts") [Doc. No. 23] ¶¶ 7, 9.

The defendant Cap Gemini Ernst & Young Welfare Benefit Plan ("the Plan") is an insurance plan governed by the Employee Retirement Income Security Act ("ERISA"). Pl.'s Facts ¶ 2. The plan is sponsored by CapGemini and provided to its employees. Def. CapGemini's Rule 56 Statement ("CapGemini's Facts") [Doc. No. 34] ¶ 1.

American issued a Group Accident Insurance Policy to CapGemini effective July 1, 2001. Pl.'s Facts ¶ 11.

2

## 2.    **Patricia's Employment with CapGemini**

Patricia commenced employment with CapGemini as a consultant in March 1991.  Pl.'s Facts ¶ 6.  As an employee, Patricia was enrolled in the Plan as amended from time to time.  Id. ¶ 8.  The benefits of the Plan included accidental death coverage.  Id.  As a Plan participant, Patricia paid the full cost of her accidental death coverage through premiums deducted from her bi-weekly paychecks.  Id. ¶ 9.  Heller was the beneficiary of Patricia's $1,000,000 accidental death coverage.  Id. ¶ 10.

Effective July 1, 2001, American issued a Group Accident Insurance policy to CapGemini.  Id. ¶ 11.  The policy provided inter alia that "[t]he Company [American] will provide certificates of insurance for delivery to each Insured describing the coverage provided, any limitations, reductions, and exclusions applicable to the coverage and to whom benefits will be paid."  Id. ¶ 12.  According to Heller "[t]he Administrative Record does not contain any evidence that any of the defendants provided Patricia with a copy of the certificate . . . ."  Id. ¶ 13.  American maintains, however, that this fact is wholly immaterial to the issues presented to the Court.  Def. American's Resp. to Pl.'s Rule 56 Statement [Doc. No. 27] ¶ 13.

Through its agent Fidelity, CapGemini prepared a document entitled "CAP GEMINI ERNST & YOUNG U.S. ACCIDENTAL DEATH & DISMEMBERMENT SUMMARY PLAN DESCRIPTION" ("summary") which became

3

effective September 2002.    Pl.'s Facts ¶ 14.    According to

Heller, the summary described the main provisions of the

accidental death and dismemberment Plan as of July 1, 2002 and

superceded any prior accidental death and dismemberment plans or

programs.    Id.    American denies that the summary contained the

"main provisions" of the accidental death and dismemberment Plan

and that the summary superceded any prior accidental death and

dismemberment plans or programs.    Def. American's Resp. to Pl.'s

Rule 56 Statement ¶ 14.    Rather, American submits, the summary

contained "part of the plan document for the [accidental death

and dismemberment] Plan and the [accidental death and

dismemberment] Plan [not the summary] supercede[d] and replace[d]

any prior group [accidental death and dismemberment] plans or

programs."    Id. (fourth and fifth alterations in original).

According to Heller, CapGemini acknowledges that it has no

evidence that Patricia was given a written copy of the summary

and merely maintains that it made the summary available to

employees on CapGemini's "HR Portal and the Fidelity benefits

website."    Pl.'s Facts ¶ 15.    CapGemini denies ever stating that

it lacks evidence that Patricia was given a written copy of the

summary.    Def. CapGemini's Resp. to Pl.'s Rule 56 Statement [Doc.

No. 46] ¶ 15.

In January 2003 Patricia resigned from CapGemini, her last

day of work being Friday January 24, 2003.    Pl.'s Facts ¶ 16.

4

The following Wednesday (January 29, 2003) while traveling for
her new employer in Atlanta, Georgia, Patricia died from injuries
sustained while riding in a taxi that collided with a tree.
American's Facts ¶¶ 12-13.  Patricia's death was an "accidental
death" within the meaning of the Plan.  Pl.'s Facts ¶ 18.
CapGemini was informed of Patricia's death by telephone on
January 29, 2003.  Id. ¶ 19.  Through an e-mail dated January 30,
2003, Maryanne Alvarez, an associate in CapGemini's National
Benefits Department notified American's Claim Manager Myra
Zimmerman of Patricia's January 24, 2003 departure from CapGemini
and her January 29, 2003 accidental death.  Id. ¶ 20.

On January 31, 2003, CapGemini issued Patricia's final
paycheck.  Id. ¶ 21.  Although Patricia had left CapGemini prior
to the last week of January, a "full" $12.00[1] premium for
participation in the benefits plan was deducted from Patricia's
paycheck.  Id. ¶ 22.  CapGemini forwarded the $12.00 premium to
American.  Id. ¶ 23.  According to CapGemini, it is "standard
company payroll practice to deduct the full premium from the last
paycheck when an employee separates from the Company."
CapGemini's Facts ¶ 10.  At no time has CapGemini or American

---

[1] That is, the total premium charged for participation in
the benefit plan is $24.00 per month or $6.00 per week.  Id. ¶
26.  From each bi-weekly paycheck $12.00 was deducted.  Rather
than deducting $6.00 from Patricia's final paycheck (to reflect
that she was no longer employed during the final week of
January), a "full" $12.00 premium was charged.  Heller's claim
rests almost entirely on this $6.00 overcharge.

offered to refund or rebate the $6.00 "unearned premium" for the period of January 25, 2003 to January 31, 2003. Pl.'s Facts ¶ 25.

On February 27, 2003, Heller submitted an American Proof of Loss Claim Form seeking accidental death benefits under the accidental death and dismemberment Plan. Id. ¶ 27. On March 20, 2003, Kristina Gorman of the CapGemini Benefits Center certified that the information contained in the proof of loss claim form was true and correct. Id. ¶ 29. Heller's claim form stated: (1) Patricia commenced work on March 25, 1991; (2) Patricia had $1,000,000 in accidental death benefits in force; (3) Patricia's effective date of coverage was July 1, 2001; (4) Patricia's date of death was January 29, 2003; (5) Patricia's last day of work was January 24, 2003; (6) Patricia's "date premium paid to" was January 29, 2003; and (7) Patricia's "termination date of coverage" was January 29, 2003. Id. ¶ 30(a)-(g).

Through an e-mail sent to CapGemini on April 14, 2003, Jill Vivian ("Vivian") of American requested a "copy of the payroll register for the last paycheck that was issued [to Patricia]." Id. ¶ 31. According to Vivian's e-mail, such information was "necessary to verify whether premiums for this coverage were being deducted and the date that premiums for this coverage were

6

paid through."  Id.[2]  In a letter to Heller dated the same day,
Vivian informed Heller that American was seeking payroll and
premium information from CapGemini.  Pl.'s Facts ¶ 32.  The
letter stated further that "[o]nce we determine the reason your
spouse was not actively at work after January 24, 2003, we will
advise you of the status of this claim."  Def. CapGemini's Resp.
to Pl.'s Rule 56 Statement ¶ 32 (alteration in original).

By e-mail dated April 28, 2003 Carolyn Berish ("Berish") of
CapGemini responded to Vivian's April 14, 2003 inquiry as
follows:

> Patricia had payroll deductions of $12.00 for the period
> 1/1/03 - 1/15/03 and the $12.00 full premium for the period
> 1/16/03 - last date worked.  There was no rebate of any
> premium, although her coverage ended on last date worked,
> which was 1/24/03.  This is standard payroll practice . . .
> .

Pl.'s Facts ¶ 33.

On April 29, 2003, Berish faxed a copy of Patricia's last
pay stub to American.  Id.  Through an e-mail dated May 12, 2003,
Berish provided American with the summary for the accidental
death and dismemberment Plan and a copy of a "VP Continuation of
Benefits Summary Sheet."  Id. ¶ 34.  According to Berish, the
continuation of benefits summary was provided to departing

---

[2] As CapGemini points out, Vivian's email also requested
that CapGemini verify "[t]he specific reason Patricia Heller was
not actively at work after January 24, 2003 . . . . Did she
terminate her employment with [CapGemini]? . . . . Did she retire
from [CapGemini]?"  Def. CapGemini's Resp. to Pl.'s Rule 56
Statement ¶ 31.

employees, but she was researching further to confirm the exact version of the form given to Patricia "apparently because the form was in the process of being updated at the time of [Patricia's] departure." Id. By e-mail dated May 13, 2003, Berish informed American that "[i]t was determined that Pat Heller did not receive the Continuation of Benefits VP Summary sheet upon her termination, although it was available to her via our HR Portal." Id. ¶ 35.

On May 29, 2003, Vivian of American prepared a claim summary recommending the denial of Heller's claim. Id. ¶ 36. Vivian noted that she had reviewed the premium verification documents and that CapGemini as policyholder "confirmed that premiums for this coverage were paid through her last day worked and her coverage under this Policy ended on her last day worked." Id. ¶ 36 (a)-(b). On June 9, 2003, Heller contacted American to check the status of his claim. Id. ¶ 37. American informed Heller that a recommendation for denial was being reviewed by management and explained the reasons for the denial. Id. Upon hearing American's explanation, Heller advised American that Patricia's premiums had been paid for the entire month of January 2003. Id. American advised Heller that according to CapGemini, premiums were paid to the last day Patricia worked. Id. According to Heller, this assertion is contrary to the information contained in Berish's April 28, 2003 e-mail. Id. ¶ 38.

8

By letter dated June 23, 2003, American denied Heller's claim for benefits under the Plan. Id. ¶ 40. American's denial letter referenced eight sources of information on which it based its decision but it did not cite Berish's April 28, 2003 e-mail which noted that Patricia paid a "full premium" for the month of January. Id. ¶ 41. The denial letter stated that it was CapGemini, not American that determined the dates premiums were paid through. Id. ¶ 42. According to American's letter, CapGemini "confirmed that premiums for this coverage were paid through her last day worked and her coverage under this Policy ended on her last day worked." Id.

American's denial letter did not address Heller's June 9, 2003 telephone call during which he noted that premium payments were deducted from Patricia's paychecks for the entire month of January 2003. Id. ¶ 44. Nor did American's letter offer to rebate the "unearned premiums." Id. According to American's denial letter, "on January 25, 2003 [Patricia] ceased to be a member of an eligible class of persons . . . and on January 29, 2003 when the injury occurred her coverage was no longer in force." Id. ¶ 45. The letter went on to state that because Patricia had not submitted a conversion application prior to her death, no coverage was available. Id. ¶ 46.

9

Heller later contacted CapGemini to follow up on Patricia's premium payments and on July 31, 2003, Lynne Oldham ("Oldham") of CapGemini wrote to Heller as follows:

As we discussed, Cap Gemini Ernst & Young ("CGE&Y["]) has previously communicated with [American], the insurer underlying the Accidental Death and Dismemberment Plan ("AD&D Plan["]) with respect to your wife's last payroll deductions for such insurance. The purpose of this letter is to confirm to you that we did so and to provide you with the content of that communication.

On April 28, 2003, Carolyn Berish (CGE&Y Employee Benefits) responded to a standard question posed by [American] with regard to final payroll deduction. Carolyn's email was sent to Jill Vivian ([American]) with a copy to Deborah Giles ([American]). The e mail indicated the following:

> "Patricia had payroll deductions of $12.000 for the period 1/1/03 -1/15/03 and the $12.00 full premium for the period 1/16/03 – last date worked. There was no rebate of any premium, although her coverage ended on last date worked, which was 1/24/03. This is standard payroll practice."

In a subsequent e mail, Tracy McGee (CGE&Y Employee Benefits) clarified to Deborah Giles ([American]) that the last day of employment was actually 1/25/03.

Id. ¶ 47.

On August 13, 2003, Oldham again wrote Heller to "further clarify" that CapGemini "did indeed take two full payroll deductions" from Patricia's January 2003 paychecks.  Id. ¶ 48. On August 20, 2003, Heller appealed American's denial of his claim.  Id. ¶ 49.  Heller argued that because full payroll deductions were taken from both of Patricia's January 2003 paychecks she was covered under the policy for that entire month.

Id. Additionally, Heller claimed, "Patricia had 31 days during which she was entitled to extend coverage under the policy." Def. American's Resp. to Pl.'s Rule 56 Statement ¶ 49.

On October 3, 2003, American received a legal opinion letter from the law firm of Mirick, O'Connell concerning Heller's claim for accidental death and dismemberment benefits. Pl.'s Facts ¶ 50; Compl. [Doc. No. 1], Ex. 9 at 1. The opinion letter noted inter alia that "[t]he sole grounds for Mr. Heller's appeal is that because [CapGemini] deducted the full premium amount for January from Mrs. Heller's paycheck, the coverage continued though [sic] January 31, 2003." Pl.'s Facts ¶ 50; Compl., Ex. 9 at 5. The opinion letter went on to conclude that given the clear language in the policy indicating that coverage had ceased, the premium payment did "not make Mrs. Heller eligible for benefits at the time of her death." Compl., Ex. 9 at 5.

On October 7, 2003 American delivered a memorandum to American's ERISA Appeals Committee. Pl.'s Facts ¶ 51. That memorandum, prepared by Vivian, informed the committee that CapGemini "confirmed that premiums for this coverage were paid through the last day worked and her coverage under this Policy ended on her last day worked." Id. The memorandum also noted that the grounds for Heller's appeal included the fact that Patricia "made bi-[weekly] premium payments through payroll deduction[s]" and that "[b]ecause full deductions were made from

11

both of the payroll checks in January 2003, she was covered under the policy through the end of January." Id.

On October 22, 2003, American prepared its ERISA Appeal review. Id. ¶ 52. The notes prepared by American indicated that Heller's sole ground for appeal was that because Patricia's premiums had been paid for the full month of January, 2003, she was covered at the time of her January 29, 2003 death. Id.[3] On December 11, 2003, American informed Heller by letter that the ERISA Appeals Committee was upholding the June 23, 2003 denial of benefits. Id. ¶ 53. The denial letter did not mention or address Heller's argument regarding Patricia's premium payments. Id. ¶ 54. Rather, the letter repeated American's earlier rationale that Patricia's coverage terminated on her last day of work and because she failed to apply for a conversion policy, there was no coverage at the time of her death. Id.

By letter dated December 20, 2004, counsel for CapGemini sought to change the administrative record as to Patricia's receipt of the VP Benefits Summary Sheet upon her separation for CapGemini. Id. ¶ 59. CapGemini contended that Patricia was, in fact provided with the summary sheet at her exit interview. Id.

---

[3] Prior to filing suit, Heller requested "copies of all materials provided to the ERISA Appeals Committee." Id. ¶ 52 n.1. Despite representing that it had provided Heller's counsel with a complete copy of the administrative record, neither the October 7, 2003 memorandum to the ERISA Appeals Committee nor the October 22, 2003 ERISA appeal review were provided to Heller until after this suit was filed. Id.

12

In response, Heller's counsel requested that an affidavit be provided justifying such a change to the record more than eighteen months after the original inquiry.  Id.  CapGemini provided an affidavit of Laurie Jadick-Geiger which stated that it was CapGemini's standard human resource practice to provide a VP Benefits Summary Sheet to departing employees on their last day of work.  Id.

### 3.   Relevant Plan Provisions and Documents

CapGemini is the plan administrator and named fiduciary of the accidental death and dismemberment Plan.  American's Facts ¶ 1.  The Plan authorizes CapGemini to delegate its fiduciary responsibility.  Id. ¶ 2.  CapGemini delegated its authority to American as evidenced by the summary, which provides that American is responsible for evaluating claims and paying benefits under the Plan.  Id. ¶ 3.  The summary provided that American had "sole discretionary authority to determine eligibility for benefits and to interpret the terms of the insurance policy." Id. ¶ 4.

The Group Accident Insurance Policy issued by American provides that an insured's coverage under the policy

> ends on the earliest of: (1) the date this Policy is terminated; (2) the premium due date if premiums are not paid when due; (3) the date the Insured requests, in writing, that his or her coverage be terminated; or (4) the date the Insured ceases to be a member of any eligible class(es) of persons as described in the Classification of Eligible Persons section of the Master Application.

13

CapGemini's Facts, Ex. 2 at 3 (emphasis added).  The Master Application referenced in the policy lists "Class I" of eligible persons as "[a]ll active full-time employees working an average of 30 hours per week, all active part-time employees working an average of 20 hours per week, and all retirees of [CapGemini]." CapGemini's Facts, Ex. 17 at 1.

According to the portion of the summary entitled "Termination of Coverage", coverage under the accidental death and dismemberment Plan "will cease on the day in which one of the following occurs:" (1) "You are no longer employed by a participating employer"; (2) "The [accidental death and dismemberment] Plan terminates or is amended to exclude the class of individuals that includes you or your dependents"; (3) "If you become eligible for coverage under a plan intended to replace this coverage"; (4) "If [American] terminates the policy"; (5) "If the Company discontinues the Plan"; or (6) "If premiums due under the insurance policy have not been timely paid". CapGemini's Facts, Ex. 1 at 9.  Additionally, the summary contains a provision regarding conversion of Plan benefits.  Id. at 10.  Under this provision, coverage may be converted to an individual policy if a written application is received by American within 31 days after coverage ends.  Id.  It is undisputed that Patricia did not exercise the conversion option.

14

### 4.   Heller's Claims

Heller's Complaint originally contained five counts.  Compl. ¶¶ 39-50.  Count I alleges that "[b]ecause Patricia paid premiums for her [accidental death and dismemberment] coverage to January 31, 2003, the plaintiff is entitled to $1,000,000 [in accidental death and dismemberment] benefits arising from Patricia's January 29, 2003 accidental death."  Id. ¶ 40.  Count II alleges that because CapGemini deducted the "full $12.00 premium" from Patricia's last paycheck (which American accepted) and because CapGemini and American were aware of Patricia's January 24, 2003 separation from CapGemini and January 29, 2003 accidental death, Heller is entitled to $1,000,000 in AD&D benefits.  Id. ¶ 42.

Count III alleges that because CapGemini admits that its regular business practice was to deduct "full" premiums from departing employees' final paychecks, Heller is entitled to $1,000,000 in accidental death and dismemberment benefits.  Id. ¶ 44.  Counts IV and V have been voluntarily dismissed.  American's Facts ¶ 21.  Although Heller's Complaint does not enunciate the precise legal premise on which he bases his claims, he has since indicated that he proceeds under the theory that because the defendants continued to collect premiums from Patricia after she separated from CapGemini, they have "waived" any defense that Patricia was no longer covered under the terms of the Plan at the time of her death.  Pl.'s Mem. in Supp. of Mot. for Summ. J.

15

("Pl.'s Mem.") [Doc. No. 19] at 2-3.[4]  Further, Heller argues

that the defendants have failed to demonstrate that Patricia's

coverage had terminated at the time of her death.  Pl.'s Opp'n to

Defs.' Mot. for Summ. J. ("Pl.'s Opp'n") [Doc. No. 36] at 5-6.

## II.   DISCUSSION

### A.   Standard of Review

The matter before the Court was originally docketed as cross

motions for summary judgment.  Prior to oral argument, however,

the parties agreed that this Court was to treat the matter as a

case stated.  Continental Grain Co. v. Puerto Rico Mar. Shipping

Auth., 972 F.2d 426, 429 n.7 (1st. Cir. 1992) (observing that

resolution of a matter as case stated rather than cross motions

for summary judgment promotes judicial efficiency); Boston Five

Cents Sav. Bank v. Sec'y of Dep't of Hous. & Urban Dev., 768 F.2d

5, 11-12 (1st Cir. 1985) (same).  Unlike cross motions for

summary judgment, this procedure allows the Court to determine

"significant issues of material fact."  Continental Grain Co.,

972 F.2d at 429 n.7.[5]  Thus, the Court must review the record,

---

[4] Both American and CapGemini initially construed Heller's
Complaint as invoking equitable estoppel principles.  Def.
American's Mem. in Supp. of Mot. for Summ. J. [Doc. No. 22] at
12; Def. CapGemini's Mem. in Supp of Mot. for Summ. J.
("CapGemini's Mem.") [Doc. No. 30] at 15.

[5] This Court previously had the occasion to observe:

Cases challenging denial of benefits under an ERISA-
governed plan frequently reach a stage where the parties
file cross motions for summary judgment.  In many instances,

16

draw reasonable inferences, apply the governing law, and enter
such judgment as may be appropriate.

Courts review a denial of benefits under an ERISA benefits
plan de novo, "unless the plan 'gives the administrator or
fiduciary discretionary authority to determine eligibility for
benefits or to construe the terms of the plan,' in which case the
question becomes whether the denial was arbitrary and
capricious." Radford Trust, 321 F. Supp. 2d at 238-39 (citing
Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 114-15
(1989); Recupero v. New England Tel. and Tel. Co., 118 F.3d 820,
826-27 (1st Cir. 1997)). "For purposes of reviewing benefit
determinations by an ERISA plan administrator, the arbitrary and
capricious standard is functionally equivalent to the abuse of
discretion standard." Wright v. R.R. Donnelley & Sons Co. Group
Benefits Plan, 402 F.3d 67, 74 n.3 (1st Cir. 2005)(citing Pari-

---

however, resolution of the case rests primarily or
exclusively on evaluation of the administrator's or
fiduciary's decision in light of the record it had before
it, a record that is typically already before the court at
the summary judgment stage.  Should such cases proceed past
the summary judgment stage, the "trial" may well consist of
nothing more than presentation of the administrative record
to the same judge who considered it at the summary judgment
stage, because neither party is likely to have a right to a
jury trial. . . .
     ERISA cases based solely or even primarily on the
administrative record are thus uniquely fit for pre-trial
resolution [as a case stated].

Radford Trust v. First Unum Life Ins. Co. of Am., 321 F. Supp. 2d
226, 239 (D. Mass. 2004) (internal citations omitted).

Fasano v. ITT Hartford Life & Accident Ins. Co., 230 F.3d 414, 419 (1st Cir. 2000).

Heller recognizes that under the Plan Administrative Document, CapGemini, as plan administrator was given discretionary authority to interpret the Plan, make factual findings, determine rights, and decide disputes. Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n") [Doc. No. 36] at 2; Pl.'s Facts ¶ 61. Nonetheless, Heller maintains, because it is undisputed that it was not CapGemini but American that made and communicated the decision denying benefits, American cannot rely on language in the Plan Administrative Document granting CapGemini discretionary authority. Pl.'s Opp'n at 2. As CapGemini points out however, it was permitted to and did delegate its discretionary authority to American as evidenced by the summary, which provided that American "has the sole discretionary authority to determine eligibility for benefits and to interpret the terms of the insurance policy. All determinations and interpretations made by [American] are conclusive and binding on all parties." Def. CapGemini's Reply in Supp. of Mot. for Summ. J. ("CapGemini's Reply") [Doc. No. 38] at 2; see Sidou v. Unumprovident Corp., 245 F. Supp. 2d 207, 218-19 (D. Me. 2003) (observing that summary indicating that discretionary authority had been delegated is sufficient evidence of effective delegation).

18

Although the Plan Administrative Document permits such delegation, Heller maintains, "no procedures for such delegation (as required by ERISA) were set forth in the Plan Administrative Document." Pl.'s Opp'n at 2 (citing Rodriguez-Abreu v. Chase Manhattan Bank, 986 F.2d 580, 584 & n.6 (1st Cir. 1993) for its explanation that "ERISA allows named fiduciaries to delegate responsibilities . . . through express procedures provided in the plan."); see 29 U.S.C. § 1105(c)(1) ("The instrument under which a plan is maintained may expressly provide for procedures (A) for allocating fiduciary responsibilities . . . among named fiduciaries, and (B) for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities"). Accordingly, Heller contends, American should not be permitted to rely on the language of the summary as evidence of delegation. Pl.'s Opp'n at 3.

CapGemini does not discount ERISA's delegation requirement discussed in Rodriguez-Abreu and observes, for that very reason, the Plan Administrative Document specifically provides:

The Plan Administrator shall be authorized, to the extent deemed advisable, to designate persons or entities to carry out fiduciary responsibilities allocated to each, and to rely upon such information, data, statistics, or analysis provided by such person or entities who perform functions under the Component Plans.

CapGemini's Reply at 3 (emphasis added). Accordingly, CapGemini correctly maintains, it followed the necessary procedures required by ERISA. Id.; see Lee v. MBNA Long Term Disability &

19

Benefit Plan, No. 04-3105, 2005 U.S. App. LEXIS 4990, *23-24 (6th
Cir. Mar. 29, 2005) (unpublished opinion) (holding that plan
document permitting delegation when "allowed" by plan
administrator sufficiently specified the "procedure" for
delegation under 29 U.S.C. § 1105(c)(1));[6] Madden v. ITT Long
Term Disability Plan for Salaried Employees, 914 F.2d 1279, 1284
(9th Cir. 1990) (concluding that plan document stating that
administrator "may delegate" its authority complied with section
1105(c)(1)'s procedural requirement).

Heller alternatively argues that because CapGemini failed to
furnish Patricia with a copy of the summary, the Court should
ignore the delegation of authority contained therein. Pl.'s
Opp'n at 3. As Heller observes, ERISA requires that participants

---

[6] See proposed Fed. R. App. P. 32.1(a) (proscribing
restrictions on the citation to unpublished opinions that are not
similarly imposed on published opinions). Proposed subsection
(a) reads:

No prohibition or restriction may be imposed upon the
citation of judicial opinions, orders, judgments, or other
written dispositions that have been designated as
"unpublished," "not for publication," "non-precedential,"
"not precedent," or the like, unless that prohibition or
restriction is generally imposed upon the citation of all
sources.

Id. As already required by some circuits, Subsection (b) of the
proposed rule provides that a copy of an unpublished opinion
cited in a court document and not available on electronic
databases must be submitted to the court. See, e.g., 1st Cir. R.
32.3(a)(3).

But see generally Niketh Velamoor, Proposed Federal Rule of
Appellate Procedure 32.1 to Require that Circuits Allow Citation
to Unpublished Opinions, 41 Harv. J. on Legis. 561 (2004)
(identifying potential shortcomings of the proposed rule).

20

be "furnished" with a summary plan description.  Id. (citing 29
U.S.C. §§ 1021-1024).  Furthermore, Heller notes, "[w]here ERISA
requires that materials, including but not limited to
[summaries], be furnished to participants, the relevant ERISA
regulations require administrators to 'use measures reasonably
calculated to ensure actual receipt of the material by plan
participants . . . ."  Id. (citing 29 C.F.R. § 2520.104b-1(b)(1);
Leyda v. Alliedsignal Inc., 322 F.3d 199, 202-03, 208-09 (2d Cir.
2003)).

Heller acknowledges that although 29 C.F.R. § 2520.104b-1(c)
permits disclosure through electronic media, it requires that
"[t]he administrator take[] appropriate and necessary measures
reasonably calculated to ensure that the system for furnishing
documents--(A) Results in actual receipt of transmitted
information (e.g., using return-receipt or notice of undelivered
electronic mail features, conducting periodic reviews or surveys
to confirm receipt of the transmitted information)."  Pl.'s Opp'n
at 3-4 (citing 29 C.F.R. § 2520.104b-1(c)) (emphasis added).

Heller contends that merely making the summary available to
Patricia through CapGemini's HR portal was insufficient to
"furnish" Patricia with the summary because such a measure was
not reasonably calculated to result in her actual receipt.  Id.
at 4.  Moreover, Heller argues, the Court should ignore the
summary because CapGemini has failed to provide any evidence of

21

Patricia's actual receipt of it. Id. CapGemini counters that the electronic posting of the summary was reasonably calculated to ensure actual receipt by Patricia because "repeated reminder voicemails were sent to employees referring them to the resources available to them regarding their benefits." CapGemini's Reply at 4. Additionally, CapGemini points out, similar "emails were also sent to plan participants during the annual enrollment period." Id.

Whether Patricia was properly furnished with a copy of the summary, however, does not affect CapGemini's effective delegation of discretionary authority to American. Heller has cited no authority for the proposition that failure to properly furnish a summary to a participant forecloses that summary from evidencing an effective delegation of discretionary authority. In fact, the First Circuit has held that although "ERISA does require plan administrators to provide certain benefits plan information such as Summary Plan Descriptions, to all plan participants and beneficiaries[, it] also provides limited and specific remedies if an administrator fails to do so." Watson v. Deaconess Waltham Hosp., 298 F.3d 102, 105 (1st Cir. 2002) (emphasis added).[7] "When ERISA itself has specified a duty and

---

[7] As the court in Watson noted, 29 U.S.C. § 1132(c)(1)(B) "specifies the relief available to such plaintiffs, allowing for penalties of $100 per day [that the information is not furnished after being requested] 'and such other relief as [the court] deems proper.'" 298 F.3d at 112. (second alteration in

22

corresponding remedy, [courts should] impose a further duty on fiduciaries only in very narrow circumstances." Id. "Technical violations of ERISA's notice provisions generally do not give rise to substantive remedies outside [the remedies provided by ERISA] unless there are some exceptional circumstances, such as bad faith, active concealment, or fraud."[8] Id. at 113 (citations omitted).

Because Patricia's receipt of the summary does not affect the summary's underlying substance and more precisely, its indication of CapGemini's delegation of discretionary authority to American, the denial of benefits in this case should be reviewed under an arbitrary and capricious standard of review. Rodriguez-Abreu, 986 F.2d at 584 (observing that arbitrary and capricious standard of review applies to benefit decision made by entity with authority delegated pursuant to 29 U.S.C. § 1105(c)(1)). It bears noting that even if American's determination were reviewed de novo, its denial of benefits was correct under the explicit language of the Plan as discussed in greater detail below.

**B.    Termination of Patricia's Coverage Under the Plan**

According to Heller, comparison of the summary and the actual policy reveals a conflict as to the date that coverage

---

original).

[8] Heller makes no such allegations.

23

terminates. Pl.'s Opp'n at 5. As mentioned above, the relevant
portion of the Group Policy provides that coverage ends on "the
date the Insured ceases to be a member of any eligible class(es)
of persons described . . . in the Master Application." Id.
Under the relevant provision of the summary, Heller points out,
coverage terminates when an individual is "no longer employed" by
the participating employer. Id. According to Heller, this
constitutes a conflict between the Group Policy and the summary.
Id. Because the summary expressly states that in the event of
conflict between the summary and Group Policy, the terms of the
Group Policy control, Heller maintains, the Court should ignore
the language of the summary. Id.

Heller next points out that according to the Master
Application referenced in the Group Policy, the relevant eligible
class includes "[a]ll active full-time employees working an
average of 30 hours per week." Id. According to Heller, this
description reveals an ambiguity as to the date coverage
terminates. Id. at 5-6. That is, "[n]either the word
'active[9]', nor the manner for determining when an employee is

_____

<sup>9</sup> The First Circuit previously has suggested, however, that
the term "active, full-time employee" as used in an insurance
policy is unambiguous. Perry v. New England Bus. Serv., 347 F.3d
343, 345 (1st Cir. 2003) ("Perry's argument flies in the face of
the unambiguous terms of the Plan. Under Section IV an
employee's 'eligibility terminates on the date [she] ceases to be
an Active Full-Time Employee . . . .")(alteration in original,
emphasis added).

24

working '30 hours per week' is defined in the either [sic] Master Application or Group Policy." Id. at 5. Thus, according to Heller, there exists "an ambiguity as to whether Patricia [] worked an average of 30 hours per week during January 2003." Id. at 6. Because ambiguities are construed against the drafter, Heller claims, the defendants have not established conclusively that Patricia's coverage terminated on January 24, 2003. Id. (citations omitted).

In response, CapGemini notes that both the summary and Group Policy state that when an insured is no longer an employee, coverage ceases. CapGemini's Reply at 5. In other words, even though identical language was not used in both documents "the only reasonable interpretation of both provisions is that coverage ceased when one is no longer an employee." Id. Additionally, CapGemini notes, even if an ambiguity did exist, Heller cites no decisions within the First Circuit reasoning that where an ambiguity exists concerning the active employee requirement, the employee is to be considered covered under the policy. Id. Rather, CapGemini points out, "this is simply a question of interpretation of Plan language, a task that has been delegated to [American]." Id.

Assuming arguendo that Heller is correct in his assertions that there is a conflict between the Group Policy and the summary, that the Group Policy governs, and that there exists an

25

ambiguity in the Master Application, it is inconceivable that
Patricia was an "active full-time employee[] working an average
of 30 hours per week" at the time of her death under any
reasonable interpretation of that language.  Pl.'s Opp'n at 5.
It is uncontested that Patricia had left the employ of CapGemini
and was working for a new employer at the time of her death.  It
is simply impossible for Patricia to have been both an active and
former employee of CapGemini at the same time.[10]

Thus, the unambiguous language of the Plan makes clear that
Patricia's coverage terminated when she left the employ of
CapGemini.  Burnham v. Guardian Life Ins. Co., 873 F.2d 486, 489-
90 (1st Cir. 1989) ("straightforward language in an ERISA-
regulated insurance policy should be given its natural meaning .
. . . So long as contract language is plain and free from
ambiguity, it must be construed in its ordinary and usual
sense.")(internal quotation marks and citations omitted).
Therefore, American's denial of benefits based on Patricia's
ineligibility was neither arbitrary nor capricious because it is
beyond dispute that Patricia had severed her employment with

---

[10] Thus, even if an ambiguity exists as to whether Patricia
"worked an average of 30 hours per week during January 2003",
Pl.'s Opp'n at 6, because there is no question as to whether
Patricia was an "active employee" of CapGemini at the time of her
death, it is clear that she was not covered under the Plan.
Stated differently, whether Patricia worked an average of 30
hours per week in January 2003 is only relevant if it is first
established that she was an active employee of CapGemini at the
time of her death.

CapGemini at the time of her death.    Indeed, the decision was correct.

Heller argues further that because the defendants repeatedly misled him and failed to address his argument regarding unearned premiums, the decision denying benefits was "incorrect, unreasonable, arbitrary, and capricious" as matter of law.    Pl.'s Mem. at 14-19.    Specifically, Heller points out, during his June 9, 2003, telephone conversation with American, he argued that because the full premium for the month of January had been collected, Patricia should have had coverage at the time of her death.    Id. at 16.    According to Heller, American "misleadingly responded" that it had been informed by CapGemini that premiums were only paid through the last date Patricia worked.    Id.    "It simply cannot be reasonable", Heller contends, "to mislead claimants about crucial facts."    Id.[11]    Similarly, Heller

_____

[11] Contrary to Heller's assertion, it is not clear that American "misled" him about Patricia's premium payments.    To support his claim that American lied about being informed by CapGemini that premiums were paid only through the last day that Patricia worked, Heller relies on Berish's April 28, 2003 e-mail to American.    Id. at 12.    According to Heller, that e-mail provided American with knowledge that CapGemini had charged Patricia for a period covering the entire month of January 2003.    Id.    Berish's e-mail, however, stated that $12.00 was charged for the period covering January 16, 2003 through the "last day worked."    Pl.'s Facts ¶ 39 (emphasis added).    Heller assumes that because American knew that $12.00 was charged, it understood those premiums to cover a period beyond the last day worked. This does not necessarily follow.    Rather, Berish's e-mail demonstrates that American knew that CapGemini had overcharged Patricia for her coverage pursuant to CapGemini's standard payroll practice.

27

maintains that it was equally unreasonable for American to not
address his argument related Patricia's premium payments. Id. at
17.

This argument, however, is unavailing. Whether American
retained an unearned premium does not change the fact that under
the terms of the Plan, Patricia was not covered at the time of
her death. While Heller may have a valid claim against CapGemini
for the apparent overcharge, that does not alter the terms of the
Plan. Dusablon v. Raytheon Corp., No. 96-11000-NG, 1997 U.S.
Dist. LEXIS 12564, *29 (D. Mass. 1997) (Cohen, M.J.) (quoting
Shull v. State Mach. Co., Inc. Employees Profit Sharing Plan, 836
F.2d 306, 308 (7th Cir. 1987) for the proposition that under the
arbitrary and capricious standard of review "a court will not set
aside the denial of a claim if the denial is based on a
reasonable interpretation of the relevant plan documents.").
Instead, the charge and retention of the "unearned" premium
relates to Heller's argument that the terms of the Plan were
waived by CapGemini and American.

## C.   Waiver of Non-Coverage Defense

Heller's chief argument focuses not on the terms of the Plan
but the defendants' alleged waiver of them. Pl.'s Mem. at 2-14.
According to Heller, "it is well established law that
'[a]cceptance and retention of premiums with knowledge of the
facts may serve to create a waiver . . . as to defenses

28

inconsistent with such retention." Id. at 10 (citing 17 Lee R. Russ, Couch on Insurance § 239:121 at 239-138 (3d ed. 2000)). Waiver is "the voluntary and intentional relinquishment of a known right" which is "determined from all of the facts and circumstances surrounding each case." Alan Corp. v. Int'l Surplus Lines Ins. Co., 823 F. Supp. 33, 42 (D. Mass. 1993) (Gorton, J.) (citations omitted); see also, United States v. Morgan, 384 F.3d 1, 7 (1st Cir. 2004) ("Waiver is the intentional relinquishment or abandonment of a right"); Irons v. FBI, 811 F.2d 681, 686 (1st Cir. 1987) withdrawn on reh'g on other grounds, 880 F.2d 1446 (1st Cir. 1989) ("the common denominator of all legal definitions of 'waiver' is the purposeful relinquishment of an appreciated right.").[12]

Whether a party has waived a given right is matter of fact. See, e.g., McCord v. Horace Mann Ins. Co., 390 F.3d 138, 143 (1st Cir. 2004). Under Massachusetts law, the party seeking to rely upon the alleged waiver of another has the burden of proving it. Brennan v. Carvel Corp., 929 F.2d 801, 810 (1st Cir. 1991). Heller claims that American and CapGemini waived their defense that Patricia's coverage terminated on January 24, 2003, because

---

[12] Heller attempts to define waiver more broadly. According to Heller, the waiver definition includes intentional conduct inconsistent with a claimed right. Pl.'s Reply Mem. in Supp. of Mot. for Summ. J. and in Opp'n to Defs.' Mots. for Summ. J. ("Pl.'s Reply") [Doc. No. 44] at 4. Heller, however, does not cite a single case from within the First Circuit defining waiver in such a manner.

29

CapGemini collected premiums (which American accepted), for a period covering the entire month of January 2003. Pl.'s Mem. at 11.

To advance his argument, Heller notes first that although the Fifth Circuit is the only federal jurisdiction to recognize a general waiver doctrine under ERISA, this Court has the authority to fashion a federal common law remedy under ERISA based on waiver principles. Id. at 3, 5 (citing Iwata v. Intel Corp., 349 F. Supp. 2d 135, 142 n.1 (D. Mass. 2004) (quoting Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831 (2003))). Indeed, Heller maintains, the relevant First Circuit case law supports relief on the facts of this case "because under the federal common law of ERISA, an insurer or plan administrator can waive, by conduct inconsistent with such defense, a defense otherwise available under the policy or plan." Id. at 4.

To support this proposition, Heller relies heavily on the First Circuit's decision in Glista v. Unum Life Ins. Co. of Am., 378 F.3d 113 (1st Cir. 2004). In Glista, the insurer originally denied benefits based on a specific "treatment" clause in the benefits plan. Id. at 118. At a later court proceeding, the insurer raised for the first time a different "symptoms" clause as a basis for its denial. Id. at 128. The court refused to allow this defense. Id. In reaching this result, the court relied on ERISA and its implementing regulations' requirement

30

that a plan administrator provide a claimant with the specific reason or reasons for its denial of a claim. Id. As the court noted, this requirement is designed to give beneficiaries an explanation for a denial of benefits that is adequate to ensure meaningful review of the denial. Id. at 129 (citations omitted).

Before reaching its decision, the court observed that "[s]ome courts have held that the administrator waived defenses to coverage not articulated during the claims review process when the administrator had sufficient information to have raised those defenses if it so chose." Id. at 131 (citations omitted). The court noted further that "other courts have held that state common law doctrines of waiver have no place in review of ERISA claims . . . ." Id. (citations omitted). The court concluded that "[u]nder these circumstances, we think the 'appropriate equitable relief' is to hold Unum to the basis it articulated in its internal claims review process for denying benefits, i.e., the Treatment Clause." Id. at 132.

CapGemini observes that the facts of Glista are "very different from the case at bar." Def. CapGemini's Opp'n to Mot. for Summ. J. ("CapGemini's Opp'n") [Doc. No. 45] at 10. The distinguishing feature of Glista, CapGemini suggests, is the fact that Unum in failing to provide the claimant with the proper basis for its denial, violated an express provision of ERISA requiring insurers to clearly identify the rationale behind a

31

denial.  Id.  CapGemini notes that this is "very different from the present case where Defendants always gave [Heller] the same, consistent answer for why he was not entitled to the proceeds" of the policy.  Id.

The court in Glista articulated the precise reasons for its decision to bar Unum from raising a new basis for denying benefits.  Glista, 378 F.3d at 131-32.  First, the court observed, "traditional insurance law places the burden on the insurer to prove the applicability of exclusions . . . ."  Id. at 131 (citations omitted).  Second, because the plan at issue "expressly provide[d]" that participants were to receive the "specific reason or reasons for [a] denial" of benefits, "Unum could hardly be caught by surprise by an insistence that it comply with its own plan."  Id. at 132.

Third, Unum had sufficient information before it to raise the defense earlier and "offered no explanation" for why it had not previously done so.  Id.  Finally, the court cited the seriousness of the participant's medical condition which according to the court, "calls for resolving this controversy quickly."  Id.  Based on the forgoing factors, the court concluded that equitably, Unum must be held "to the basis that it articulated in its internal claims review process for denying benefits, i.e., the Treatment Clause."  Id.  As American has consistently asserted the same basis for its denial of benefits

and does not now seek to assert an alternative justification, CapGemini is thus correct in its assertion the concerns raised in Glista are inapposite here. CapGemini Mem. at 10.

Moreover, CapGemini points out, as the court ruled in Alan Corp., "[i]n Massachusetts, the doctrine of waiver does not control where an insured argues that an insurance company has waived the limits of coverage defined in an insurance policy. . . . [Nor can w]aiver [] be used to extend coverage of an insurance policy [or] create primary liability." CapGemini's Opp'n at 11 (quoting Alan Corp., 823 F. Supp. at 42)(internal quotation marks and citations omitted); accord Nieves v. Intercontinental Life Ins. Co., 964 F.2d 60, 66 (1st Cir. 1992) (noting that "under Puerto Rico law, the coverage or scope of an insurance policy cannot be extended by waiver or estoppel."). According to CapGemini, Heller is asking this Court to alter the terms of the Plan to create coverage where none otherwise exists. Id. Therefore, CapGemini argues, applying waiver principles in this case is "impermissible." Id. Because Alan Corp. involved an interpretation of state law, however, that decision does not automatically foreclose this Court from fashioning a waiver remedy under the federal common law of ERISA. 823 F. Supp. at 42

As the First Circuit ruled in Rodriguez-Abreu, "[i]ssues of relinquishment of rights and waiver are governed by federal common law developed in ERISA cases rather than by particular

33

state law although state law may inform the development of the
federal common law." Rodriguez-Abreu, 986 F.2d at 587 (citations
omitted, emphasis added). As Heller points out, the First
Circuit has explicitly held that it is possible for a beneficiary
to waive her rights under an insurance plan based on the federal
common law of ERISA. Pl.'s Mem. at 5 (citing Rodriguez-Abreu,
986 F.2d at 587). It follows, argues Heller, that an insurer can
be deemed to have waived plan provisions under the same body of
common law. Id. at 4.

Even assuming that it is possible for American to have
"waived" its right to deny coverage under the federal common law
applicable to ERISA[13], Heller has not carried his burden of
establishing waiver on these facts. Indeed, all of the cases
cited by Heller applying waiver are distinguishable in that they
involved insurers that clearly manifested their intent to
relinquish policy rights. For example, Heller relies heavily on
the Fifth Circuit's decision in Pitts v. American Sec. Life Ins.
Co., 931 F.2d 351 (5th Cir. 1991). Pl.'s Mem. at 5. Although
the group insurance policy at issue in Pitts required a minimum

---

[13] Although this Court does not attempt to answer whether in
the First Circuit the underlying parameters of coverage can be
waived, such a result does not appear likely. See Perry, 347
F.3d at 345-46 & n.3 (observing in case where benefits were
denied because plaintiff was no longer an active full-time
employee, that employer/administrator's continued treatment of
plaintiff as an employee "cannot alter the clear and unambiguous
terms of the Plan.").

of ten enrolled employees, the insurer continued to accept premiums and pay benefits for five months after discovering "beyond all doubt" that only one employee was enrolled and that coverage was therefore unavailable. Pitts, 931 F.2d at 357.

Thus, by accepting premiums and paying benefits for a substantial period of time after learning that coverage lapsed under the plan's explicit terms, the insurer in Pitts clearly signified its understanding that coverage continued despite the policy language. By acting in a manner wholly inconsistent with non-coverage, the insurer evinced its intentional and voluntary capitulation of its right to disavow the existence of coverage. Id. Unlike the insurer in Pitts, American accepted only a single $6.00 premium following the termination of Patricia's coverage. Further, American has consistently maintained that despite the $6.00 charge, coverage terminated upon Patricia's separation from CapGemini and has steadfastly refused to pay benefits.

Moreover, unlike the collection at issue in Pitts, after coverage lapsed under Patricia's policy, American did not collect a premium at a time when Heller reasonably relied on the availability of coverage. That is, the single premium at issue in this case was not charged until after Patricia died. Pl.'s Facts ¶ 21. Given the Plan's explicit language that coverage terminates upon an employee's separation from CapGemini, it cannot be suggested that Heller relied on the availability of

35

benefits at the time the "unearned" premium was charged.  Rather,
it was not until he received his wife's final paycheck and
discovered that a "full" $12.00 had been deducted, that Heller
sought benefits under the Plan.  Thus, based on the Plan's
explicit terms, there could have been no expectation of coverage
at the time the "unearned" premium was charged.

Conversely, in Pitts, premiums were continuously charged and
benefits paid for months after the insurer learned the
participant was disqualified under the plan.  Pitts, 931 F.2d at
353.  As the court noted, the insurer could have easily protected
its right to deny coverage "by executing an ordinary reservation
of rights" but instead accepted premiums and paid benefits
without limitation.  Id. at 357.  By continuing to collect
premiums at a time when the insured's expectation of coverage was
foreseeable, the insurer more clearly demonstrated its knowing
relinquishment of the plan's explicit terms.[14]  In this case,
however, Heller could not reasonably have expected coverage at
the time the premium at issue was collected.

---

[14] To be sure, whether an insurer induces reliance on the
availability of coverage is not an element of waiver.  This
factor is relevant, however, because waiver is determined by all
of the facts and circumstances surrounding a case.  Alan Corp.,
823 F. Supp. at 42.  Accordingly, an insurer's awareness of a
beneficiary's expectation of coverage at the time the premium is
collected is circumstantial evidence that the insurer, in
accepting the premiums, intended to relinquish its right to deny
coverage.

36

Similarly, in <u>Rhorer</u> v. <u>Raytheon Eng'rs & Constructors,</u>
<u>Inc.</u>, 181 F.3d 634 (5th Cir. 1999), another case relied upon by
Heller, a clearer case of waiver was presented. In <u>Rhoher</u>, the
evidence demonstrated that the insurer knew about the
participant's ineligibility under the plan for <u>several months</u> yet
continued to accept premiums during that time. <u>Rhoher</u>, 181 F.3d
at 637, 645.[15] Accordingly, it was error for the district court
to grant summary judgment in favor of the insurer because "a
reasonable jury could conclude that [the insurer] knowingly
waived its right to enforce" the terms of the policy. <u>Id.</u> at
645. There too and unlike the case at bar, premiums were
collected for a significant period of time during which an
insurer-induced expectation of coverage existed.

Heller also relies on the Second Circuit's decision in
<u>Lauder</u> v. <u>First Unum Life Ins. Co.</u>, 284 F.3d 375 (2d Cir. 2002),
which presented facts similar to the First Circuit's decision in
<u>Glista</u>. In <u>Lauder</u>, as in <u>Glista</u>, the insurer initially denied

---

[15] Consonantly, in <u>Burger</u> v. <u>Life Ins. Co. of N. Am.</u>, 103 F.
Supp. 2d 1344 (N.D. Ga. 2000), another case cited by Heller, the
insurer <u>actually provided benefits</u> for <u>three years</u> after learning
that the insured was not entitled to the amount of benefits
provided. <u>Id.</u> at 1348-49. According to the court, this was
"compelling evidence" that the insurer "voluntarily relinquished
its right to recalculate [the insured]'s benefits." <u>Id.</u> at 1348.
Heller also relies on <u>Lamb</u> v. <u>Provident Ins. Co.</u>, No. 2:93CV40-B-
D, 1994 U.S. Dist. LEXIS 21136 (N.D. Miss. Oct. 4, 1994)
(unpublished opinion). In that case, the insurer accepted
premiums for <u>ten months</u> after learning that the insured became
disqualified under the plan. <u>Id.</u> at *13. On that basis, the
insurer's motion for summary judgment was denied. <u>Id.</u>

benefits for one reason and later attempted to assert an alternative basis for its denial.  <u>Lauder</u>, 284 F.3d at 380. Although the court held that the insurer had waived its second justification by failing to assert it earlier, the court heavily qualified its recognition of waiver principles.  <u>Id.</u> at 381-82. First, the court made clear that its decision was limited to the specific facts of that case.  <u>Id.</u> at 382.  More importantly, the court distinguished the case before it from cases in which waiver would not apply.  <u>Id.</u> at 381-82.

The court began its waiver analysis by revisiting its earlier decision in <u>Juliano</u> v. <u>Health Maint. Org. of N.J.</u>, 221 F.3d 279 (2d Cir. 2000).  <u>Lauder</u>, 284 F.3d at 380.  In <u>Juliano</u>, the court held that "under the law applicable to insurance policies, an insurer may be barred from raising defenses not asserted in communications to the insured denying coverage." <u>Juliano</u>, 221 F.3d at 288.  The court added, however, that "where the issue is the <u>existence or nonexistence of coverage</u> . . . <u>the doctrine of waiver is simply inapplicable</u>."  <u>Id.</u> at 288 (citation omitted, emphasis added).[16]  The policy provision at issue required that the benefits sought be "medically necessary."  <u>Id.</u> Because medical necessity was required for coverage under the

_____

[16] The same limitation was recognized in <u>Russo</u> v. <u>Abington Mem'l Hosp.</u>, No. 94-195, 2002 U.S. Dist. LEXIS 15493, *41 (E.D. Pa. Aug. 1, 2002) (unpublished opinion), another decision relied on by Heller.

policy, the court concluded that it was "analogous to the existence or nonexistence of coverage" and therefore not subject to waiver. Id. (internal quotation marks omitted).

In Lauder, the insurer's original basis for denying benefits was that coverage had terminated when Barbara Lauder's ("Lauder") injury was sustained. Lauder, 284 F.3d at 378. The court rejected this rationale and held that Lauder was in fact covered under the policy. Id. at 379. Alternatively, the insurer argued that even if coverage existed, Lauder's injury was not a "disability" as defined by the policy. Id. According to the court, the insurer had waived this defense. Id. at 380-82.

As in its earlier decision in Juliano, the court distinguished "between policy conditions, which could be waived by the insurer's conduct, and the parameters of underlying coverage", which could not. Id. at 381 (citation omitted, emphasis added). The court noted that "waiver could not be used to expand the policy so that the insured extended its coverage to more than it originally bargained." Id. (citation and internal quotation marks omitted). The court explicitly noted that "Lauder's case does not raise [this] concern. Waiver here would not create coverage where none would otherwise exist; rather, Lauder's disability is exactly the type contemplated by the policy." Id. at 381.

39

The court observed that although Lauder provided the insurer with sufficient information for it to pursue an investigation of her disability, the insurer simply "chose not to do so." Id. Thus, the court noted, what the insurer actually had waived "was its right to investigate" and ruled that "the underlying disability itself was established." Id. (second emphasis added). Therefore, "[b]ecause finding waiver in this case would not expand the coverage bargained for . . . we believe Lauder's claim is distinguishable from Juliano's . . . ." Id. at 382.

As the foregoing discussion demonstrates, even if this Court were to follow Lauder, that decision provides Heller no aid. Because Patricia was no longer a CapGemini employee at the time she died, coverage did not exist under the Plan. Therefore, applying waiver would run counter to Lauder's admonition against using that doctrine to create coverage where it would not otherwise exist. Id. at 381; see also, Blum v. Spectrum Rest. Group, 261 F. Supp. 2d 697, 717 n.13 (E.D. Tex. 2003) ("the majority of courts that have examined the issue have held or noted that waiver is unavailable when it would expand the scope of coverage under an ERISA plan."). Although Heller contends that just as in Lauder, he is seeking exactly the type of benefits contemplated by the Plan (i.e., accidental death benefits), Pl.'s Reply at 5, he fails to appreciate the

significance of the fact that the Plan first contemplates coverage as a prerequisite to providing those benefits.

In Lauder, before examining whether the type of benefits sought was contemplated by the policy, the court was first required to determine whether coverage existed at the time of Lauder's injury. Lauder, 284 F.3d at 379. Unlike Lauder, it is clear in this case that coverage under the Plan had ceased at the time of Patricia's death. Thus, waiver would not apply under the rubric of Lauder because of its recognition that the non-existence of coverage cannot be waived. Id. at 381 (citing Juliano, 221 F.3d at 288).

In any event, Lauder is also inapposite because it expressly limited its recognition of waiver principles to previously unasserted defenses to coverage which the insurer had knowledge of when asserting its initial defenses. As the court noted,

First UNUM knew of Lauder's claim of disability, chose not to investigate it, and chose not to challenge it. It therefore waived its right to rely on lack of disability as a defense . . . .

Because we do not consider this the appropriate set of facts on which to create a federal common law doctrine of waiver in the ERISA context, we limit our holding to the circumstances of this particular case.

Id. at 382. As mentioned above, American continuously and consistently has asserted the same defense to coverage, namely that Patricia's coverage terminated upon her separation from CapGemini. Thus, Lauder is not on point.

41

The facts of this case are more akin to those in the Eighth
Circuit's decision in Sippel v. Reliance Std. Life Ins. Co., 128
F.3d 1261 (8th Cir. 1997). In Sippel, Larry Sippel ("Mr.
Sippel") had been a participant in his employer's accidental
death insurance policy. Id. at 1262. Under the terms of the
policy, "[the] covered person's eligibility cease[d] when his
employment ceases . . . ." Id. Mr. Sippel's employment
terminated on February 25, 1993. Id. Less than a month later he
was killed in a car accident. Id. Under the terms of the
policy, Mr. Sippel had 31 days after termination of his
employment to convert his coverage into an individual policy.
Id. At the time of his death, however, Mr. Sippel had not
applied for conversion of the policy. Id.

Following the insurer's denial of accidental death benefits,
Mr. Sippel's wife ("Sippel") brought suit under ERISA seeking
policy benefits. Id. Sippel argued that the insurer was
"estopped" from denying that an effective conversion took place
because a premium of $5.80 was deducted from her husband's final
paycheck and forwarded to the insurer. Id. at 1263. The court
"assume[d] that this payment represented the premium for the
first month of what would have been converted into individual
coverage." Id. In rejecting Sippel's argument the court
observed:

> In some circumstances receipt of a premium can work an
> estoppel against an insurance company, but we do not

42

believe, at least in an ERISA case, that this can occur <u>when</u> <u>the language of the policy is as clear as it is here</u>.

<u>Id.</u> (emphasis added).  While Heller's claim advances a theory of waiver as opposed to estoppel, the Eighth Circuit's reasoning is not unhelpful in this context.  Just as <u>Sippel</u> concluded that estoppel was inapplicable to similar facts, this Court is unpersuaded that waiver has been proven here.

Heller has not cited a single case in which waiver has been applied to facts such as these, i.e., where only a single week's premium was charged at a time when no coverage existed under the unambiguous terms of the policy.  This Court declines to apply waiver principles to American's and CapGemini's non-coverage defense because the one-time retention of $6.00 in unearned premiums is insufficient to demonstrate a voluntary and intentional relinquishment of the Plan's explicit terms.  <u>Alan</u> <u>Corp.</u>, 823 F. Supp. at 42.  Indeed, American and CapGemini have consistently maintained that despite the charge and retention of the $6.00 premium, Patricia's coverage ended on her last day of work.  Def. CapGemini's Resp. to Pl.'s Rule 56 Statement ¶ 45.

In sum, the evidence shows that at most, American and CapGemini overcharged Patricia for her coverage.  While Heller may have a valid claim for the return of the premium, he cannot use that overcharge as a means of bringing his wife's untimely and tragic death within the ambit of the Plan.  Further, Heller has failed to meet his burden of establishing that American and

43

CapGemini intentionally and voluntarily abdicated the Plan's coverage requirements by charging and retaining an unearned premium.

## III. CONCLUSION

Accordingly, American's and CapGemini's Motions for Summary Judgment [Doc Nos. 21 & 29] are ALLOWED and Heller's Motion for Summary Judgment [Doc. No. 18] is DENIED.

SO ORDERED.

William G. Young

WILLIAM G. YOUNG
CHIEF JUDGE

45